## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DONQIA JEROME BEAVERS, SR.,  CASE NO. 1:23-cv-10204

     *Plaintiff*,  Thomas L. Ludington
*v.*       United States District Judge

RALPH HARRISON, JR.,  Patricia T. Morris
and KYLE REIHL,   United States Magistrate Judge

     *Defendants*.
_____/

## REPORT AND RECOMMENDATION ON DEFENDANTS HARRISON AND REIHL'S MOTION FOR SUMMARY JUDGMENT (ECF No. 18)

### I. RECOMMENDATION

For the following reasons, **I RECOMMEND** that this Court **GRANT** Defendants Harrison and Reihl's motion for summary judgment (ECF No. 18). If adopted, the Court would dismiss Beavers's complaint in its entirety.

### II. REPORT

#### A. Introduction

Donqia Beavers filed this § 1983 action alleging that while he was detained at a county Jail, two officers "yank[ed]" him out of his cell, pointed a taser at him, and placed him in handcuffs—all without "reason." Beavers alleges that this incident caused a "minor" shoulder injury.

1

While Beavers's complaint describes a brazen and arbitrary use of force, the evidence reveals that the officers' conduct was both justified and measured. Indeed, Beavers was only ordered out of his cell after he addressed an officer using profanity. Officers did not resort to pushing Beavers forward until he resisted orders to walk towards a holding cell. The officers only drew a taser on Beavers to place him in handcuffs after he turned towards the officers and challenged them to "try something." And while Beavers alleges that he sustained a shoulder injury, the record contains no evidence of physical injury. Both officers have now moved for summary judgment.

### B.    Background

Detained in a cell at the Clare County Jail awaiting trial, Donqia Beavers engaged in an unyielding course of disorderly behavior that required officers to control him through escalating means. (ECF No. 18-1, PageID.97–98). The incident began in January 2023 when Beavers approached a door to his cell and asked Officer Kyle Reihl for a medical "kite"—a form used to send written messages to jail staff concerning medical issues. (ECF No. 18-2, PageID.101; ECF No. 28, PageID.162).

On Reihl's behalf, Officer Ralph Harrison slid a kite through the cell's door. (ECF No. 18-2, PageID.101). But by mistake, Harrison did not hand Beavers the correct kite form for medical issues. (*Id.*) And upon noticing that Harrison had

handed him the wrong form, Beavers told Harrison that he had requested "a fucking med[ical] kite." (ECF No. 28, PageID.162).

Harrison then walked around Beavers's cell to a second door which he opened before directing Beavers to exit the cell so they could "talk" about Beavers's use of profanity. (ECF No. 18-2, PageID.101; *see also* ECF No. 18-3, Exhibit C 00:08–00:31). Beavers refused to exit and instead told Harrison to enter the cell if he wished to have a discussion. (ECF No. 18-2, PageID.101; *see also* ECF No. 18-3, Exhibit C 00:31–00:41). Harrison then ordered Beavers, again, to exit the cell, and Beavers complied. (ECF No. 18-2, PageID.101). Beavers then "became aggressive and began using a threatening tone," prompting Harrison to order him to walk down the hallway towards the jail's holding cell. (*Id.*)

Beavers refused to walk, so Harrison placed both hands on Beavers's left shoulder and escorted him down the hallway using "the least amount of force necessary" to move Beavers forward. (*Id.*; *see also* ECF No. 18-3, Exhibit C 00:41–00:55). Surveillance footage shows that after a few steps, both Harrison and Beavers simultaneously fell forward. (ECF No. 18-3, Exhibit C 00:49–00:52). It is not clear whether Harrison pushed Beavers, or whether Beavers lurched forward and caused Harrison to lose his balance. (*Id.*) Either way, Beavers retained his balance and continued to walk down the hallway undeterred and showing no signs of injury. (*Id.*)

At this point, Reihl, who had been observing Beavers and Harrison, followed Beavers down the hallway alongside Harrison. (ECF No. 18-3, Exhibit D 00:09–00:33). Neither Officer touched Beavers as they walked behind him. (*Id.* at 00:27–00:46). Eventually, Beavers turned toward the officers and told Harrison, in a "threatening tone" that he "wasn't anything" and that he should "try something." (ECF No. 18-2, PageID.101; *see also* ECF No. 18-3, Exhibit D 00:43–48).[1] Harrison then drew his taser and pointed it at Beavers while Reihl placed Beavers in handcuffs. (ECF No. 18-3, Exhibit D 00:43–01:45). Once Reihl handcuffed Beavers, Harrison holstered his taser and both officers continued to follow Beavers as he walked towards the holding cell. (ECF No. 18-3, Exhibit D 00:43–01:45; *id.* at Exhibit E; *id.* at Exhibit F 00:00–00:23). From this point, the officers escorted Beavers into the holding cell without touching him. (*Id.* at Exhibit D 00:43–01:45; *id.* at Exhibit E; *id.* at Exhibit F 00:00–00:23).

After Beavers entered the cell, Harrison closed the door behind him and ordered Beavers to approach the door and turn around to have his handcuffs removed. (ECF No. 18-2, PageID.101; *see also* ECF No. 18-3, Exhibit F 00:20–00:38). Beavers declined and instead challenged Harrison to enter the cell and "take

---

[1] Harrison wrote in an incident report that Beavers turned to face him and Reihl "with clenched fists . . . ." (ECF No. 18-2, PageID.101). But the surveillance footage shows that Beavers turned toward the Officers with his left hand open and his right hand holding a kite form. (ECF No. 18-3, Exhibit D 00:43–48).

'em off."  (ECF No. 18-2, PageID.101).  Harrison then left Beavers in the cell for about four minutes before another officer returned to remove the handcuffs.  (ECF No. 18-3, Exhibit F 00:36–07:18).  In total, Beavers spent fewer than ten minutes handcuffed.  (*Id.* at Exhibit D 00:58–01:58; *id.* at Exhibit E; *id.* at Exhibit F 00:00–00:23; *id.* at Exhibit F 00:36–07:18).

Soon after the officer removed Beavers's handcuffs, Harrison approached the cell to speak with Beavers.  (*Id.* at Exhibit F 08:10).  Harrison explained that as punishment, Beavers could either transfer to solitary confinement or return to his cell and lose access to the Jail's video visitation kiosk, called "Home Wav," for three days.  (ECF No. 28, PageID.164–65; *see also* ECF No. 18, PageID.74 n.2).  Although Harrison told Beavers that he could choose between these punishments, he wrote in his incident report that he suspended Beavers's Home Wav access for three days because no segregation cells were available.  (ECF No. 28, PageID.163–65; ECF No. 18-2, PageID.101).

A few days later, Beavers attended a "health assessment" where he denied any "recent injury."  (ECF No. 18-5, PageID.112).  He also denied "joint problem[s]," and his arms and legs appeared "normal" on examination.  (*Id.*)  Over the next several weeks, Beavers sent numerous medical kites and received medical care for a variety of issues unrelated to the incident with Harrison and Reihl.  (ECF No. 18-6).  For example, Beavers received care for "mild" degeneration and "wedging" in

his spine as well as pain and numbness in his legs.  (*Id.* at PageID.115–18, 122–28, 131–34).  He also received a tuberculosis test and personal hygiene supplies.  (ECF No. 18-5, PageID.112; ECF No. 18-6, PageID.118–21, 136).

Beavers later filed this action against Reihl and Harrison, alleging that they violated his Eighth Amendment right to be free of cruel and unusual punishment.  (ECF No. 1, PageID.4–5).  In particular, he alleges that for "no reason," Harrison "yank[ed]" him by the shoulder, that Reihl placed him in handcuffs, and that one of the two officers "dr[e]w a taser on" him.  (*Id.* at PageID.5).  Beavers alleges that he sustained a "minor shoulder injury" during the incident, but he does not clarify whether the injury resulted from Harrison yanking him by the shoulder or from Reihl placing him in handcuffs.  (*Id.*)  Similarly, Beavers alleges that he was "not able to get proper medical attention," but does not clarify whether he alleges that he did not receive proper medical attention for his alleged shoulder injury or whether he alleges that Harrison's failure to bring the proper medical kite form interfered with his access to medical care.  (*Id.*)  Beavers also mentions that an unidentified officer suspended his access to the jail's video visitation kiosk for three days, preventing him from speaking with both his attorney and his wife.  (*Id.*)

The Court screened Beavers's claims soon after he filed his complaint.  (ECF No. 4).  Despite Beavers's allegations regarding his suspended Home Wav access, the Court construed Beavers's complaint as alleging only that Harrison and Reihl

"used excessive force" and "denied medical care." (*Id.* at PageID.18, 20–21).[2] On these causes of action, the Court found that Beavers stated a plausible claim for relief. (*Id.*)

Harrison and Reihl have now moved for summary judgment. (ECF No. 18). Beavers has not responded to their motion even though the Court has extended his deadline to do so. (ECF No. 32 (extending Beavers's deadline from November 7, 2023, to May 7, 2024)).

## C.    Standard of Review

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that would affect "the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court's role at summary judgment is not "to

---

[2] I understand the Court's screening order to have dismissed all claims against Harrison and Reihl except for those it listed: Beavers's claims of excessive force and inadequate medical care. (ECF No. 4, PageID.18, 20–21). If Beavers disagreed with the Court's description of his complaint, then he could have either filed an amended complaint or moved for reconsideration to salvage any claims regarding his revoked video visitation privileges. *See Pipes v. United States*, No. 1:07-cv-057, 2007 WL 4191775, at *3 (D. N.D. Nov. 21, 2007). Because Beavers availed himself of neither option, his only live claims concern Reihl and Harrison's use of force and their interference with his access to medical care. *Cf. Wilson v. Woodford*, No. 2:05-cv-0876, 2017 WL 661961, at *3 (E.D. Cal. Feb. 17, 2017) (citing *Thomas v. Wilber*, No. 1:10-cv-0006-AWI-SKO PC, 2014 WL 972156, at *4 (E.D. Cal. Mar. 12, 2014)). *See generally NLRB v. S.W. Gen., Inc.*, 580 U.S. 288, 302 (2017) (internal quotation marks omitted) ("[E]xpressing one item of [an] associated group or series excludes another left unmentioned.").

weigh the evidence and determine the truth of the matter but to determine whether there . . . are any genuine factual issues that properly can be resolved only by a finder of fact . . . ." *Id.* at 249–50, 255.  Accordingly, "the evidence, all facts, and any inferences that may be drawn from the facts" must be viewed "in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).  The nonmoving party cannot rebut a Rule 56 motion by merely alleging that a genuine factual dispute exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.3 (1986) (quoting Fed. R. Civ. P. 56(e)).  Instead, the nonmoving party must show that there is sufficient evidence in the record for "a reasonable finder of fact [to] find in its favor." *Anderson*, 477 U.S. at 248.

The party moving for summary judgment bears the initial burden of establishing the absence of a genuine dispute of material fact. *Carver v. Bunch*, 946 F.2d 451, 454–55 (6th Cir.1991).  So even where a summary judgment motion is unopposed, the Court still must scrutinize the motion to determine whether the moving party has met its burden. *Id.*

### D.    Analysis

#### 1.    Exhaustion

Harrison and Reihl first argue that the Court should grant summary judgment without reaching the merits of Beavers's claims because he failed to exhaust his

administrative remedies before filing his complaint, as required by the Prison Litigation Reform Act ("PLRA").

Under the PLRA, prisoners may not bring actions against prison officials to challenge the conditions of their confinement without first exhausting their administrative remedies. 42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516, 523 (2002); *Booth v. Churner*, 532 U.S. 731, 741 (2001). And not only must prisoners exhaust their administrative remedies before filing a complaint, but they must do so "properly," meaning that they must "compl[y] with an agency's deadlines and other critical procedural rules . . . ." *Woodford v. Ngo*, 548 U.S. 81, 90, 92 (2006).

Because exhaustion is an affirmative defense, prison officials, not inmates, carry the burden proof. *Jones v. Bock*, 549 U.S. 199, 216 (2007). Until a defendant proves otherwise, the Court must presume that the prisoner properly exhausted his or her administrative remedies before filing suit. *Id.*; *see also Napier v. Laurel Cty.*, 636 F.3d 218, 225 (6th Cir. 2011). And where a defendant seeks summary judgment on basis of exhaustion, the defendant also carries the initial burden presenting evidence in support of defense showing that there is no genuine dispute of material fact. *Celotex Corp.*, 477 U.S. at 323.

The defendants here have not met this burden. Unlike a party who seeks summary judgment on an issue that its opponent carries the burden of proof, a defendant moving for summary judgment on an affirmative defense cannot simply

assert an absence of evidence and leave its opponent to its proofs. *See id.*; *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001). That is so even where the affirmative defense at issue requires the defendant to prove a negative, such as a prisoner's failure to exhaust. *Napier*, 636 F.3d at 225; *see Lamb v. Kendrick*, 52 F.4th 286, 294–95, 298 (6th Cir. 2022); *accord Mercado v. Dep't of Corr.*, No. 3:16-CV-1622, 2018 WL 2390139, at *6 (D. Conn. May 25, 2018). True, proving the absence of evidence may often be a difficult task. But "[a]t the end of the day, someone must carry the burden" of proving or disproving exhaustion, and the PLRA reflects Congress's judgment that "it is considerably easier for a prison administrator to show a failure to exhaust than it is for a prisoner to demonstrate exhaustion." *Lamb*, 52 F.4th at 295 (internal quotation marks omitted); *see Mattox v. Edelman*, 851 F.3d 583, 590 (6th Cir. 2017).

How can a defendant prove the absence of any fully exhausted grievances? A defendant might, as one district court has suggested, supply an affidavit or declaration from an individual who conducted an "exhaustive search" of the prisoner's records, attesting that the prisoner filed no relevant grievances. *See Brown v. Beard*, No. 13-00465, 2021 WL 1807875 (E.D. Pa. May 5, 2021). Alternatively, a defendant may supply *all* of the plaintiff's grievances alongside an affidavit certifying that those grievances comprise the prisoner's complete grievance record. *See Mercado*, 2018 WL 2390139, at *6.

Yet Harrison and Reihl provide no such evidence. Although they supply a copy of the Jail's grievance procedures to establish that administrative remedies existed, they cite no evidence regarding whether Beavers engaged in this process. (ECF No. 18, PageID.78; ECF No. 18-4). True, the Defendants assert that "there is no grievance in [Beavers's] jail file regarding" the incident discussed in his complaint. (ECF No. 18, PageID.78). But they provide no exhibits to support this fact, and an attorney's bare assertions in a brief are not evidence. *Associacao Brasileira de Medicina de Grupo v. Stryker Corp.*, 891 F.3d 615, 621 (6th Cir. 2018). Because the Defendants cite no evidence disproving the existence of a grievance that could have exhausted Beavers's claims, they have not carried their initial burden of establishing the absence of a genuine dispute of material fact. For that reason, I recommend that the Court decline to enter summary judgment in favor of Harrison and Reihl on the basis that Beavers failed to exhaust his administrative remedies.

## 2.    Constitutional Violations

Turning to the merits of Beavers's complaint, Harrison and Reihl argue that the Court should enter summary judgment in their favor because Beavers cannot genuinely dispute whether they utilized excessive force or interfered with his access to medical care. (ECF No. 18, PageID.79–93). In the alternative, both Defendants argue that even if they violated Beavers's constitutional rights, they are entitled to

qualified immunity because whatever rights they may have violated were not clearly established.  (*Id.* at PageID.79–81, 88, 90, 93).

Under the doctrine of qualified immunity, a government official can only be held liable for violating an individual's constitutional right if that right was "clearly established" at the time.  *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016) (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013)).  So to overcome the defense, a plaintiff suing a government official must prove not only that the official violated a constitutional right, but that "no reasonably competent official would have concluded that the actions taken were unlawful."  *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).

Courts have discretion to address these two questions in either order.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  But where "a discussion of why the relevant facts do not violate clearly established law" would reveal "that in fact the relevant facts do not make out a constitutional violation at all," the most efficient approach is to begin and end the analysis by evaluating whether the official violated a constitutional right.  *Id.*

Such is the case here.  Harrison and Reihl did not violate a clearly established right—not because the rights at issue present complicated and undecided questions of constitutional law, but because the alleged violations fall far short of offending the Constitution.  So for the reasons discussed below, I suggest the Court find that

neither Harrison nor Reihl violated Beavers's constitutional rights, let alone rights that were clearly established.

### a.     Excessive Force

Beavers alleges that the Officers' use of force violated the Eighth Amendment's prohibition of cruel and unusual punishment. (ECF No. 1, PageID.4–5).  But because the "the state does not acquire the power to punish until" an individual is convicted of a criminal offense, the Eighth Amendment does not apply to pretrial detainees like Beavers. *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983); *see also Graham ex rel. Est. of Graham v. County of Washtenaw*, 358 F.3d 377, 382 n.3 (6th Cir. 2004).  His excessive force claims instead fall under the Due Process Clause of the Fourteenth Amendment. *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013).

A Fourteenth Amendment excessive force claim consists, in essence, of three elements.  First, while an official need not have intended his or her use of force to be "excessive," the official's use of force must be "deliberate." *Kingsley v. Hendrickson*, 576 U.S. 389, 395–96 (2015).  That is, the official's use of force must be knowing or purposeful, as opposed to negligent or accidental. *Id.*[3]  An official

---

[3] *Kingsley* left open the issue of whether an official could be held liable for the reckless infliction of harm.  576 U.S. at 395–96.  Although it has not addressed whether the Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the reckless use of excessive force, the Sixth Circuit has held that officials may be held liable for reckless

13

who, for example, "trips and falls" on a detainee or "accident[ly]" discharges a taser does not violate due process.  *Id.*

Second, the official's use of force must be "objectively unreasonable."  *Id.* at 396–97.  An official, of course, may not "punish" a pretrial detainee.  *Id.* at 397–98. But absent "an expressed intent to punish," an official's use of force is still excessive if it does not "rationally" further a "legitimate nonpunitive governmental purpose" or if it "appear[s] excessive in relation to that purpose."  *Id.* at 398 (internal quotation marks omitted) (quoting *Bell v. Wolfish*, 441 U.S. 520, 538, 561 (1979)).  Thus, it matters not whether the official intended to use more force than necessary to achieve a legitimate end—only whether a hypothetical "reasonable officer on the scene" would have found the force to be reasonable based on the information available "at the time."  *Id.* at 397.

To determine whether a use of force was "objectively reasonable," courts should consider all relevant circumstances, including:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting."

---

actions in cases challenging an inmate's conditions of confinement.  *Brawner v. Scott Cty.*, 14 F.4th 585, 596–97 (6th Cir. 2021).

*Id.* And in evaluating these factors, courts should defer to the "'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell*, 441 U.S. at 540).

Third, the use of force (though not the resulting injury) must be more than "*de minimis*." *Leary v. Livingston Cty.*, 528 F.3d 438, 443–45 (6th Cir. 2008) (citing *Bell*, 441 U.S. at 539 & n.21). Even if completely gratuitous and divorced from any legitimate government purpose, trivial uses of force upon a pretrial detainee do not violate the Due Process Clause. *Id.*[4]

Beavers alleges three, distinct uses of force: that Harrison pushed him down a hallway, that Harrison pointed a taser at him without firing, and that both officers placed him in handcuffs for almost ten minutes. Although each action was deliberate, Beavers cannot genuinely dispute that they were excessive because each use of force was either de minimis or objectively reasonable.

### 1. The Push

---

[4] The Sixth Circuit recently held that that there is no "de minimis" exception to excessive force claims brought under the Fourth Amendment; a completely gratuitous use of force against a free citizen—no matter how slight—is excessive. *Chaney-Snell v. Young*, 98 F.4th 699, 715–20 (6th Cir. 2024). But the Court has not abrogated its holding that pretrial detainees must prove more than *de minimis* force under the Fourteenth Amendment. *See id.* at 719. And the Court's opinion in *Chaney-Snell* suggests that it is unlikely to do so. *Id.* (reasoning that "a jail's unique security needs . . . may justify" the requirement that a detainee, unlike a "'free citizen,'" may need to show more than *de minimis* force).

Beavers first alleges that Harrison used excessive force by briefly placing his hands on Beavers's shoulders to escort him down the hallway and by later shoving him forward.  But this claim fails for a few reasons.

First, Harrison applied a trivial degree of force.  The Supreme Court long remarked that even where government action does not rationally further a legitimate state interest, there is "a *de minimis* level of imposition with which the [Due Process Clause] is not concerned."  *Bell*, 441 U.S. at 539 & n.21 (quoting *Ingraham v. Wright*, 430 U.S. 661, 674 (1977)) (internal quotation marks omitted).  To be sure, the Court has only recognized this principle in dicta—perhaps because it is "unusual" for a pretrial detainee to sue an official for a use of force that was neither painful nor threatening.  *Leary*, 528 F.3d at 444; *e.g.*, *Bell*, 441 U.S. at 539 & n.21; *Ingraham*, 430 U.S. at 674.

Yet that principle is the law in the Sixth Circuit.  Taking its cue from the Supreme Court's dicta, the Sixth Circuit held *in Leary v. Livingston County* that an unjustified use of force against a pretrial detainee was too trivial to constitute excessive force. 528 F.3d at 443.  In *Leary*, an official approached a pretrial detainee charged with criminal sexual conduct, called the detainee a "sick prick," and "struck" the detainee "on the back of the neck."  *Id.* at 441.  The detainee later described the blow as a "karate chop" that "didn't hurt or nothing."  *Id.* at 443, (internal quotation marks omitted).  The detainee did not feel "threatened" by the

16

officer, and there was no "verifiable injury" to indicate that that the officer used more than a "negligible" quantum of force. *Id.* at 443–44. Despite chastising the officer's conduct as "rude and unprofessional," the Sixth Circuit reasoned that a "touching that neither 'hurt' nor threatened the" affected individual is too trivial to offend the Constitution. *Id.* at 444–45. To hold otherwise, the Court feared, would "blur[] the line[] between" state tort law and due process. *Id.* at 445.

Like the "karate chop" in *Leary*, Harrison's shove and escort hold were brief, painless, and nonthreatening. Although firm, Harrison's escort hold lasted for only a few seconds, and there is no evidence that it either hurt Beavers or led hm to feel threatened. (ECF No. 18-3, Exhibit C 00:41–00:55; ECF No. 18-5; ECF No. 18-6). The same is true of Harrison's shove. Undaunted, Beavers immediately recovered from the shove and remained on feet.  (ECF No. 18-3, Exhibit C 00:49–00:52) Based on the surveillance footage, Beavers does not appear to have sustained an injury, and he did not complain to medical staff of any injury in the weeks following the incident. (*Id.*; ECF No. 18-5; ECF No. 18-6). Although Beavers need not show a physical injury to prevail on an excessive force claim, the absence of any physical injury indicates that Harrison applied little force. *See Leary*, 528 F.3d at 444.

Even if Harrison's shove and escort hold were forceful enough to implicate the Due Process Clause, they were reasonable under the circumstances. In essence, *Kingsley* instructs courts to assess whether an official's use of force is objectively

17

reasonable by evaluating whether the degree of force applied was proportionate to the "problem at issue." *See Kingsley*, 576 U.S. at 397.

On one hand, Harrison needed to use some level of force to gain compliance. Permitting detainees to swear at officers and disobey routine orders undermines officers' authority, which in turn compromises security. *See Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984); *Huff v. Tabler*, No. 3:18-CV-122, 2019 WL 3499494, at *3 (N.D. Ind. July 31, 2019); *Nilges v. Gilmour*, No. 16-cv-00884, 2018 WL 1610303, at *12 (D. Colo. Apr. 2, 2018). And when an inmate refuses to obey an order, jail officials have few "options at their disposal to maintain discipline and security." *Huff*, 2019 WL 3499494, at *3. So, when Beavers addressed Harrison using profanity, Harrison had a legitimate interest in addressing the issue. And when Beavers refused orders to exit his cell and walk towards the holding cell, Harrison was "entitled to use" some degree of force. *Id.*

On the other hand, Harrison attempted to limit the amount of force applied. He did not touch Beavers until Beavers had ignored verbal orders, he escorted Beavers using "the least amount of force necessary to gain compliance," and he stopped pushing Beavers forward soon after Beavers began to walk on his own volition. (ECF No. 18-2, PageID.101; ECF No. 18-3, Exhibit C 00:41–00:55). Further, there is no evidence of physical injury. (ECF No. 18-3, Exhibit C 00:41–00:55; ECF No. 18-5; ECF No. 18-6).

18

At bottom, Harrison's use of force was objectively reasonable.  For that reason, too, I recommend that the Court grant summary judgment in Harrison's favor to the extent Beavers alleges that Harrison applied excessive force by pushing him.

### 2.    The Taser and Handcuffs

Next, Beavers alleges that Harrison utilized excessive force by aiming a taser at him while Reihl placed him in handcuffs.  Harrison first attempts to circumvent the issue of whether his action was reasonable by arguing that merely pointing a taser at a detainee "does not even involve the use of force."  (ECF No. 18-3, PageID.87).

But that issue is beside the point.  The Fourteenth Amendment's Due Process Clause protects pretrial detainees from *all* forms of "punishment."  *J.H. v. Williamson Cty.*, 951 F.3d 709, 717–18 (6th Cir. 2020).  And punishment may be inferred whenever a government official injures a pretrial detainee either in an "excessive" response to a legitimate objective or without rationally furthering a legitimate government interest at all.  *Id.* (internal quotation marks omitted) (quoting *Bell*, 441 U.S. at 538–39).  So regardless of whether a threat of violence can be considered a use of "force," threats are still subject to scrutiny under the Due Process Clause—and under the same standards as uses of force.  *See Kingsley*, 576 U.S. at 397–98.

Similarly, Harrison and Reihl move the Court to grant summary judgment in their favor to the extent that Beavers claims their use of handcuffs was excessive, because, they contend, handcuffing a detainee for just under ten minutes is a *de minimis* use of force that cannot implicate due process. (ECF No. 18, PageID.90). That argument has little merit. Surely, being handcuffed for ten minutes is an ordeal that few would dismiss as "trivial" or "*de minimis*." The issue is not whether handcuffing is sufficiently forceful to implicate due process. Of course it is. The issue is whether Reihl and Harrison's use of a taser and handcuffs was justified under the circumstances. *See Kingsley*, 576 U.S. at 397–98.[5]

On *that* basis, Harrison and Reihl are entitled to summary judgment. After Beavers turned towards the Officers and threatened to fight them, Harrison and Reihl

---

[5] Rather than assess their use of handcuffs under *Kingsley*, Harrison and Reihl argue that Beavers must present evidence that: (1) he "complained" that his "handcuffs were too tight," (2) an "officer ignored" his complaints, and (3) he "experienced 'some physical injury' resulting from the handcuffing." (ECF No. 18, PageID.89 (internal quotation marks omitted) (quoting *Morrison v. Bd. of Trustees*, 583 F.3d 394, 401 (6th Cir. 2009)). But the case they rely on in support of this three-pronged test predates *Kingsley*, and it discusses Fourth Amendment searches of free citizens, not punishment of pretrial detainees. *Morrison*, 583 F.3d at 401. Further, the test they reference applies to "unduly tight handcuffing" during an otherwise reasonable arrest. *See Lyons v. City of Xenia*, 417 F.3d 565, 575–76 (6th Cir. 2005). And a free citizen's failure to complain of unduly tight handcuffing would not be fatal to a Fourth Amendment excessive force claim if any use of handcuffs would have been unreasonable in the first instance. *Lyons v. City of Xenia*, 90 F. App'x 835, 855 (6th Cir. 2004) (Tarnow, J., concurring); *Nettles v. Duffett*, No. 1:22-cv-10615, 2022 WL 2402662, at *5 & n.4 (E.D. Mich. Apr. 1, 2022). So regardless of whether the Court applies a Fourth or Fourteenth Amendment rubric, it must assess the reasonableness of the officers' decision to handcuff Beavers.

were justified in ensuring their own safety by constraining Beavers. *Cf. Brown v. Acting Director*, 360 F. App'x 48, 53, 55 (11th Cir. 2010).  And in constraining Beavers, Harrison and Reihl used the least amount of force necessary.  Indeed, Harrison only pointed his taser at Beavers long enough to allow Reihl to place Beavers in handcuffs, immediately holstering his taser one Beavers was subdued. (ECF No. 18-3, Exhibit D 00:43–01:45).  There is no evidence that the handcuffs were applied tighter than necessary, and Harrison attempted to remove the handcuffs as soon as Beavers was placed in the holding cell.  (ECF No. 18-2, PageID.101; *see also* ECF No. 18-3, Exhibit F 00:20–00:38).  He only left Beavers handcuffed in the cell for a few additional minutes because Beavers did not allow him to remove the handcuffs upon entering.  (ECF No. 18-3, Exhibit F 00:36–07:18).  Thus, I suggest that there is no genuine dispute at to whether Harrison or Reihl violated Beavers's due process rights by pointing a taser at him and placing him in handcuffs.  The Court, therefore, should enter summary judgment in favor of Harrison and Reihl on these claims.

### b.      Medical Care

Last, Reihl and Harrison move for summary judgment on Beavers's claim that they interfered with his access to medical care.  "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well

being." *Wilson v. Williams*, 961 F.3d 829, 839 (6th Cir. 2020); *see also DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 199–200.  Thus, the state has a duty to provide for an inmate's "basic human needs," including "food, clothing, shelter, medical care, and reasonable safety." *Deshaney*, 489 U.S. at 200.

Like claims of excessive force, claims challenging a pretrial detainee's conditions of confinement in a state jail flow from the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment's proscription of cruel and unusual punishment.  *See City of Revere*, 463 U.S. at 244; *see also Griffith v. Franklin Cty.*, 975 F.3d 554, 566 (6th Cir. 2020).  Those protections are "at least as" extensive as those provided by the Eighth Amendment.  *See City of Revere*, 463 U.S. at 244.

Claims under both Eighth and Fourteenth Amendments consist of an objective component, evaluating the gravity of the deprivation at issue, and a subjective component, assessing the responsible official's mental state.  *Greene v. Crawford Cty.*, 22 F.4th 593, 605 (6th Cir. 2022).  Courts apply the same objective standard under both Amendments.  *See id.* at 605–06.  Only deprivations of "necessit[ies] of civilized human existence" are sufficiently serious to violate the Constitution.  *Hadix v. Johnson*, 367 F.3d 513, 525 (6th Cir. 2004).  What constitutes a "necessity of civilized human existence" is determined by "contemporary standards of human decency" rather than a court's own "notions of enlightened policy."  *Id.* (internal

quotation marks omitted) (quoting *Tillery v. Owens*, 907 F.2d 418, 426 (3d Cir. 1990)). By their nature, prisons are "[h]arsh and uncomfortable," so only "'extreme deprivations'" that deprive inmates of the "'the minimal civilized measure of life's necessities'" violate the Eighth Amendment. *Id.* (first quoting *Hudson v. McMillan*, 503 U.S. 1, 9 (1992); and then quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). These "minimal necessities" encompass basic human needs such as adequate medical care, food, shelter, and safety. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

The Eighth and Fourteenth Amendments diverge on their subjective components. The Eighth Amendment imposes on prisoners the onerous task of proving that an official "subjectively perceived facts from which to infer substantial risk to the prisoner," that the same official "did in fact draw the inference," and that the official "then disregarded that risk by failing to take reasonable measures to abate it." *Griffith*, 975 F.3d at 568 (quoting *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018)).

Pretrial detainees must satisfy a far less arduous standard. Under the subjective component, a pretrial detainee must prove "'more than negligence but less than subjective intent—something akin to reckless disregard.'" *Brawner v. Scott Cty.*, 14 F.4th 585, 597 (6th Cir. 2021) (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)). Put another way, "a plaintiff must prove that

the defendant acted "deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known."  *Greene*, 22 F.4th at 606 (quoting *Brawner*, 14 F.4th at 597).

Beavers fails on both prongs.  Although Beavers's complaint does not clearly explain how officials interfered with his medical needs, the record contains no evidence that he received inadequate healthcare.  To the extent, Beavers alleges Harrison's failure to supply the proper kite form for medical issues violated his right to due process, Harrison and Reihl submit several copies of Beavers's correspondence with medical personnel, showing that Beavers freely messaged healthcare staff several times over the following weeks.  (ECF No. 18-6).  And to the extent Beavers alleges that Harrison or Reihl injured his shoulder, his medical record contains no evidence of a shoulder injury, and he denied having had a recent injury at a medical appointment just three days after his encounter with Harrison and Reihl.  (*Id.*; ECF No. 18-5).

With no evidence of inadequate healthcare, Beavers cannot genuinely dispute either that he incurred a sufficiently serious injury or that Harrison and Reihl recklessly disregarded his need for medical care.  For those reasons, I recommend that the Court enter summary judgment in favor of Harrison and Reihl.

### E. Conclusion

For these reasons, **I RECOMMEND** that this Court **GRANT** Defendants Harrison and Reihl's motion for summary judgment (ECF No. 18) and dismiss Beavers's complaint in its entirety.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  June 10, 2024                    s/ PATRICIA T. MORRIS
                                        Patricia T. Morris
                                        United States Magistrate Judge